We have an important case for our consideration this afternoon, but before we get to it, we have the admission of some important people to our court, and I turn it over to my colleague, Judge Schwartz. Thank you. With your permission, may it please the court, I'd like to call before the panel, Stephen Fruchetic, Patrick Horn, Walter Simons, and Josh Weiss. And I present these four terrific, super smart, kind, hardworking, and fun people for your consideration. And I'm particularly happy to present these four to this panel, because they actually have something in common with each of you. For Judge Rendell, I have two teachers, a French speaker, and an alum of Penn. And for Judge Greenaway, I have a baseball fanatic, a professional athlete, a Columbia alum, and a fan of superheroes. And why does that matter to you? Because you, my friend, are a superstar. All you've done in the last seven months, and you can go on and on, I've witnessed it as your compatriot on many panels over the last spring, and so have my pals here. To present each of them to you, I have decided to select a synonym that goes with each of them. What you need to know, this is a hard crowd to please, that the words I've picked could describe each of them. So, let me start. First I will begin with the fantastic Stephen Fruchetic. He comes to us as an undergraduate from the University of Connecticut, Emory Law School. He clerked for Judge Thompson, I'm happy to say, in the District of New Jersey. Before coming to me, he was in private practice, and when he leaves me, he will be going back to private practice in New York. Which one is that? The baseball player teacher. Okay, got it. There you go. Next, I have the wonderful Peter Horn. Peter went to Vassar College. After that, he's not a professional athlete, he was a professional cyclist. Went to NYU Law School, was in private practice, has been with me, and has agreed to stay on a second year. So, you will see him again in our next court year. So, that's Peter. Next, we have Walter Simons. Walter is our superhero fan and our Penn alum. He comes to us from Texas. He graduated from Rice, then the University of Pennsylvania Law School, my alma mater as well. Clerked for a United States District Judge in Houston, Gray Miller. And after he leaves us, he's going back home to Texas, which makes his family very happy, but his court family very sad. But he'll be making a lot of money in private practice, so he can come visit a lot. And finally, we have, and his attitude was fabulous, yes, fabulous. And we have the marvelous Josh Weiss. Josh is our Columbia alum and our former teacher. After graduating from Columbia, he did some teaching outside the U.S. Graduated from Yale Law School, was in private practice before joining me, and will be going off to clerk for another very lucky judge in the Southern District of New York very soon. So, I think that we have put forth a record that provides you a factual basis to grant the motion for admission to our beloved court. Wow. I want you to know, I know this surprises none of you, but that is the most detailed presentation in the history of the Third Circuit. I have men who have very high standards. Welcome to you all. Congratulations, and will we have the oath, please? Let's get the oath. Thank you. Will each of you solemnly swear that you will demean yourself as an attorney and counsel in this court, uprightly and according to the law, and that you will support the court's decision? I do. Well done. Congratulations. Thank you. Hard to follow that act, but yet we must. Now tell me how to pronounce your client's name. Adil Uddin. Uddin, Your Honor. Uddin? Yes, Your Honor. All right, let's get to it, sir. Yes. May it please the court, my name is Vishwanathan Rudrakumaran. I represent the petitioner in this matter, and with the court's permission, I would like to reserve three minutes for rebuttal, Your Honor. Very well, that's granted. Go ahead, sir. Your Honor, the first regarding the scope of the definition, engage in terrorist activity, and our position is, Your Honor, the scope of the question of the scope of this term is a legal question, thus the standard of review should be de novo. Having said that, then I go to the merits, Your Honor. Your Honor, there are three primary arguments. First, to be engaged in terrorist activity, our position is that it must have been condoned by the leadership. The second argument would be that state organs, the BIA and the IAEA talked about rapid battalion action. It is a state organ. It was created when the BNP was in power, and our position is state organs falls outside the purview of their tier three terrorist organization. So what's the framework in which you want us to think about this? Is it your position that we should be looking at both Hussein and Khan, and use a combination of the two in order to establish a framework? And if that's the framework, then what are the steps that we have to go through? Your Honor, in the last three years, the BIA issued nearly 55 decisions on BNP. And out of the 55, nearly 24 decisions, the BIA did not focus on it. They are remanded for some other reason, for various reasons. But out of the 55 decisions, on the 20 decisions, the BIA itself focused whether the leadership sanctioned this act. There's nothing in either the IJ or the BIA ruling here that talks about the authorization or the sanction or the ratification. Is there? Yes, Your Honor. That's the error. That's the major error. But if you read the transcript, the IJ was trying to get that from the petitioner. The IJ asked the question, did you know that the leaders called for the blockade? Did you know that the leaders called for the traffic blockade? So IJ knew that he needs this one to hang on it. But he tried to erase it from the petitioner, but the petitioner said no. The leadership never sanctioned. But I'm saying the BIA did not cite to the Seventh Circuit opinion the way many of the other BIA opinions did. They really didn't focus on the concept of authorization, did they? Yes, Your Honor. That's correct. Because the BIA opinion, Your Honor, as I said, out of 55, 20 decisions focused on the leadership. Even some of those decisions, when they found that BNP was a Tier 3 organization, they tried to plug something saying, oh, the leadership condoned it. But it's not inconsistent. It's not inconsistent. Should we remand to the agency to have them address the issue of whether the record shows authorization or ratification by the leadership of the BNP? Yes. Presently, Your Honor, there is no guidelines because the BIA's opinion is at random. It depends, as I said, who writes for the BIA. If certain judges write, they focus on the leadership. So are you asking us to hold like the Seventh Circuit and require that in order to find an organization to be a terrorist organization under the statute that there has to be evidence the leaders condoned or authorized? Yes. And then would you want us to remand back to BIA for them to determine as a matter of fact whether the facts would satisfy that test? No, the court itself can review the record and see whether the leadership has authorized because there are other BIA opinions. I don't think the remand is necessary. Maybe the court can issue a brief. Sure, but I think if we think that the BIA applied the wrong test, which is what we're saying, then really under our case law we should send it back for them to do a redo. That's the concept. I defer to the court on that point, Your Honor. The other one I would like to focus, the BIA and the IA talked about RAB, the Rabbit Battalion Action. That was created when the BNP was in power and the U.S. State Department supports them. Do we get to that? I'm so sorry. Do we get to rule on that if indeed we say that the case needs to be remanded and the framework needs to be in the first instance determining whether it's a terrorist organization, whether there's authorization and condoning, and then whether he had knowledge or should reasonably have had knowledge? If that's the initial position that you have, do we get to the other issue? Yes, Your Honor, because the IA focused that when the BNP was in power in 2006, they created this BNP. They used it as a death squad. So what they are saying is in that scenario, their leadership was involved because they created this RAB. Simply because they created it. They created it as a death squad when they were in power, when they were the government. So you're saying that from 2008 to the present, the RAB is within the control of the current government and therefore cannot be, its activities can't be imputed to the BNP. No, Your Honor, I would go a little bit further and I would argue that any state entity will not fall within the purview of terrorist legislation because the Congress has created a separate one under 28 U.S.C., the state-sponsored terrorist organization. But all the IJ did was look at the RAB's activities and say that's an indicia that the BNP is a terrorist organization. So it's unnecessary, as Judge Greenwood was saying, for us to even decide that issue. Your Honor, if you don't say, if you don't decide, if the court agrees that it also falls within the terrorist framework, then the IJ can say in 2006, RAB was created and controlled by the leadership of the BNP. But there's no evidentiary record, is there, that the BNP controls the RAB anymore? Not anymore. And did it control it in 2008 when your client joined the BNP? Yes, Your Honor, that's another thing I'm coming because Well, let me back up a minute. You're acting as though the finding by the IJ and the BIA rests solely on the RAB. But it really doesn't. It was broader than that. I mean, the fact that the RAB was violent and of the death squad was one of the indicia. But that wasn't the sole indicia, was it? Yeah, because I'm focusing on RAB because the agency can connect the leadership with RAB. They can connect the leadership with RAB. That's what I'm arguing, that RAB should be outside the purview of the whole thing. So you're saying the BNP controls the RAB, the leadership of the BNP currently in 2008? No, no. So it's not relevant, right? No, it's not relevant for the second part. Whether the petitioner knew or reasonably should have known that the BNP was a terrorist organization, for that test, for the second part of the framework, this is relevant. But isn't there, as Judge Rendell was saying, there's other evidence in the record that could support a claim that the BNP, as an entity, was authorizing new about condoned violence. There's the Wall Street Journal article that was presented, which talks about the fact that, I think the quote is, after one of the BNP leaders was locked down in her premises, the BNP had, quote, no choice but to take to the street since the government has clamped down on peaceful protest. So isn't that another piece of evidence that the BIA could have relied upon, to say that the BNP was, as an entity, was condoning violence? No, no. Taking an action, taking a civil disobedience or calling for a traffic blockade, does not translate into a violent action. This is a civil disobedience. But what about the fact that there is evidence, because remember we're reviewing this at a very deferential standard, and there is at least some evidence that following the strikes and blockades was violence and some indication that BNP members were participants. Yeah, I agree with you. BNP members participated. But the question is whether they were organized or authorized by the leadership. No, no. We had that during the election last time. The President Trump's rally, there were violence. It doesn't mean that the Republican Party condones violence. Some members engaged in violence. So you think that the Human Rights Watch in their report, it clearly states that leaders calling for, they called for a strike and a blockade. Well, of course, that activity post-dated the relevant time frame here. The relevant time frame here is 08 to 11. Yeah. And a lot of the violence that's cited has to do with 13 and 14. Yeah, sure. Yeah, because he was involved in 2008 to 2011, and RAB was 2006, and the election violence 2000 voting when the guy is here, it has nothing to do with this time period. Let's change gears for just a moment.  Yes, your Honor. My question is this. If the BIA summarily dismissed your CAT claim for lack of specificity and we have to apply an abuse of discretion standard, how can we remand that given the level of deference that we have to? No, but in court services, your Honor, this court said if they put the issue to the BIA, then that itself is sufficient for the BIA to address that issue, your Honor. Here the BIA, it was mentioned twice in the brief that it was not, the IJ's opinion was not detailed enough. No, so my point is slightly different. I know that you're saying that you mentioned it. Yeah. But I'm saying if they summarily dismissed it, and I think that's a question that we have to resolve. If they summarily dismissed it, we have to accord a certain deference. Yes, sir. And if we accord that deference, how do we get to the point where we remand? Because I understand what you want is you want to remand so that you can have your CAD claim resolved on the merits. But my question to you is how do we get there if what they did in footnote one was summarily dismiss your claim? If your point is they didn't summarily dismiss it, then tell me about that. I thought they said that it was not enough, it was not articulated enough by the petitioner. So that's why they are summarily dismissing the claim, Your Honor. But my position is that once it is there, when the issue was clearly identified, I don't think they can simply dismiss. I don't think the deference comes there, Your Honor, because there was no recent decision by the BIA on that issue. They said, oh, no, the IJ's opinion was sufficient enough, or even two, three lines like that. But they didn't even go to that part. But even if you remand on the terrorism bar, then my client can proceed with asylum. What is the asylum bar on asylum? The withholding of removal under the INA. Well, what is the dispute with the IJ's ruling? How did you sustain your burden of proof with respect to the CAT claim? Do you have to be specific about that? No, I don't think I have to argue the merits of the petitioner's claim. My argument is whether the BIA gave a sufficient reason, and then I can argue whether the BIA's reason was enough or correct, Your Honor. But I don't think I can go to the merits of the CAT claim here and argue directly. Your question was the IJ made a ruling on the CAT claim. Yes. There was an appeal to the BIA, and all that was said in the brief on appeal was that the IJ did not give specific consideration to the claim, with no explanation. And so Judge Rendell, I think, is asking, tell us what the problem was, because the BIA summarily dismissed that CAT claim because there was a lack of an explanation as to what the problem with the IJ's opinion is. And pursuant to the Code of Federal Regulations and other provisions, it has within its authority not to consider a not-developed claim. So if you want to tell us what the problem with the IJ's opinion on the CAT claim is, would they understand whether the BIA should have done something more? My question is really, I don't think I can argue directly the merits of the claim here without going, without the BIA addressing that issue. You're right. We're not asking you for merits. We're asking you, the point is the BIA said that your claim, as alleged, lacked specificity, right? So our quandary is that we have a limited review based on the regulation. There are two issues. Number one, is what they did, is what the BIA did in footnote one, summarily dismissing your claim? Yes, sir. If it is, then we have to accord some deference. If it's not, then tell us. The second and more substantive issue is, if you disagree with the conclusion despite deference, let's hear what the specificity was so that we can look at that. So those are the two issues. No, the BIA did not dismiss that claim. BIA said that he made that claim. There's a difference between an argument saying that you made that claim and then you saying that we are dismissing that claim. BIA did not say that we are dismissing that claim. Okay. So there was no summary dismissal? There's no summary dismissal. BIA said we made that claim. Thank you. All right. We'll get you back on. I'm so sorry. Yeah, I'm good. Thank you. Yeah, we'll get you back on. Thank you so much. Thank you. Thank you. Thanks for agreeing to hear the case in the afternoon. You all right? Yeah, of course. Yes. Our pleasure. Good afternoon, Your Honors. We are pleased to court. Daniel Smule on behalf of the United States Attorney General. Great. Can you pick up on this point so we can just deal with it? What substantively is the difference in your view between a summary dismissal under the red, which is accorded some degree of deference, and waiver, which is the language that is used in footnote one? Substantively speaking, there is no difference. So that's a summary dismissal in your view? What the BIA did? Yes. Essentially, yes. It is a summary. It's a waiver is what it is. The claim is not developed. We will not look at it. Therefore, the IJ's decision stands, the denial of the cat. Now, the waiver regulation is clear. I mean, certainly, petitioners or applicants for relief and protection from removal are warned that they have to develop their claim on the notice of appeal and, again, in filing their brief. And it's not mentioned in the notice of appeal? I'm sorry, Your Honor? Not mentioned in the notice of appeal, correct? Correct. That is correct. He did not mention it, yes. Now, that's all well and good if he adequately developed it in his brief to the Board of Immigration Appeals, and here the Board did not abuse its discretion by failing to note that a one-sentence line saying little more than that there was little to no analysis given to the claim was not sufficiently developed argument. I note, of course, that the IJ did, in fact, give some analysis with respect to the denial of the cat claim. In so far as the IJ noted the lack of credibility as to his claims of past harm by the Olami League, the inadequate corroborating evidence in so far as the corroborating evidence appeared to be created as a result of this litigation, as opposed to contemporaneously with any harm he may have suffered. And the third reason is that Mr. Uden failed to continue his BNP activity in the United States, despite the fact that he lived in New York City, which the IJ found had a fairly large Bangladeshi community to include BNP supporters. So on this record, there is no question that saying no more than there was inadequate analysis is not only factually inaccurate, but it failed to develop a claim and, in fact, waived it. Can I go back to just kind of a basic question here? There's a reference to the fact that the terrorist organization is to be decided on a case-by-case basis. Yes. And a reference to that is a website, actually. Can it be that – and you know where we're going with this because we ask for all these opinions about whether the BNP is a terrorist organization. Yes. Can it be that under – that one panel finds it's a terrorist organization based upon certain facts and it's all over the lot as to whether it's a terrorist organization? I mean, is that what case-by-case basis means? Or does it mean that if you have X organization come before, you know, where the issue is as to this organization, then on a case-by-case basis, when it's alleged to be tier three, you have to decide it? Sure. It seems so arbitrary that we have these rulings every which way, and very often depending upon who's on the BIA panel at the time. We know there's one judge who, if he's on the panel, he goes one way. There's another judge, a person, a panel member, goes the other way. Can this be the state of the law? I mean, I'm really tempted to say that, you know, terrorist organization needs to be determined by the BIA based upon certain facts, and if in the later situation additional facts come to light that would say that at that moment in time, indeed it was or wasn't, it could change its position. But it just seems extremely arbitrary. I certainly appreciate your point, Your Honor, and I'll attempt to answer your question and allay your concerns and underline your question, but by pointing to the scheme that Congress established with respect to terrorist organizations, broadly speaking, and the INA. You'll recall that we're talking about a so-called tier three organization. There are, of course, three tiers. Tiers one and tiers two are designated by the Secretary of State. Now tier three is different. It's done by what's the evidence of record. Now certainly a designation of any foreign entity as a terrorist organization is politically charged and belongs to the political branches of the government. That is Congress, and Congress has legislated, for example, the Taliban. Well, but the executive is making this decision as to tier three organizations, the agency. That's correct, Your Honor, and it's doing so, again, under instructions from Congress on a case-by-case basis. Well, the case-by-case probably means you have the BNP or you have the Arab whatever league or this case-by-case, but can it really be that on Monday it's a terrorist organization and on Wednesday it's not and on Friday it is? Maybe during the same time frame. It's not even that we have a collection of cases that span from the 1990s to the 2015s. We're looking at the 2008 period where you have, as the judge was saying, as you know, completely contrary decisions on whether the BNP is a terrorist organization as a tier three or not. So you know where this is going, right? I do. All right. So the question is, what limiting principles should we use? It can't be that there's a principled basis, right, when you look at this large cases, for it to be yay on three days a week and nay four days a week, right? So why doesn't it make sense to cabinet at least somewhat by using Hussein and Khan? With respect to Hussein and Khan, I will address them if I could, Your Honor. Just make one point before I address them, and that's this. The reason the court ought to cabinet them by the case-by-case basis lies in INA 242, the review provision, which says judicial review is on the record in each particular case, and that is the extent of the court's scope of review and, therefore, jurisdictional grant by the Congress. Now, with respect to Hussein and Khan, there are a couple of things going on with those opinions. Number one, both of them are dicta. That's fairly clear. In Hussein, we have a discussion that says, look, here's what might happen. I studied First Amendment law, Claiborne hardware. Here's what might happen in the principles of agency law, but here Hussein is a very active member, and so, therefore, it's irrelevant in the way we go. Whether they're dicta or not, let's just think about it as a principle. Does it make sense to you'd agree that this is about as broad as something can be written, right? Yes, you'd have to agree with that. I do. So then with that as a starting point, then why doesn't it make sense for us to somehow figure out that a terrorist organization can't basically fit everything under the sun? I think your adversary mentioned facetiously but accurately that under this definition, white Democrats and Republicans can be a terrorist organization. Yes. Technically. Technically. I appreciate your point, Your Honor. The answer to that is most readily found, I think, in the statutory definition that Congress gave us of a tier three terrorist organization. I'll give you that definition, and then we'll look, I think, more broadly at the scheme. The definition that Congress gave is a group of two or more individuals, whether organized or not, and I'd like to focus Your Honor's attention on whether organized or not. That really is tremendously broad. And what it means, it defeats, really, Kahn and Hussein's Seven-Circuit Opinions, because to have authorization, you must invariably have an organization in terms of leaders. Somebody must be able to say, I am the leader, or I have authorization to say, go out and commit political violence. Well, I'll go with your language. That is a group of two or more individuals, whether organized or not, which engages in. Yes. That's the language. It doesn't say a group whose members engage in. Doesn't that suggest to you that it's conveying to a reader, we're looking at the actions of a group as opposed to an individual member? I'm not sure that's quite right because, of course, it speaks also to or has a subgroup that engages in. But my point is, it's contrary to your brief where you said, put simply, the members are the organization. Doesn't this language tell us the group is separate from its members? I'm sorry, but I don't quite understand your question, Your Honor. I don't see the distinction. Read the language of those three. You just read us. Yes. What you said was, the section says, a group which engages in. Yes. It doesn't say a group whose members engage in, which seems to convey that the group has to have some kind of existence in and of itself, whether organized or not. Yes. So wouldn't that mean that we have to have the limiting principle here, in part would have to be that the entity is engaging in the activity, perhaps through its members, but it's the group that dictates. Be that as it may, there's still the lack, the organized or not, that defeats the point as to authorization, which is critical here. Not really. Organization defeats authorization. I mean, I think organization would mean it could be a group of people, and they may not have founding principles or a charter or bylaws. I mean, that's what an organization is about. Or leadership. Are you fighting against the Seventh Circuit, the fact that the BIA has over and over and over and over again adopted the Seventh Circuit view? I mean, the BIA has adopted that view. Are you fighting against that? The BIA, some members of the board certainly seem to adopt it, and I think that's clear from the opinions that we've decided. Some members of the, well, that's really. Certainly not all of them. Some members of this court in panel opinions that speak for the court. Yes. I mean, doesn't the BIA panel speak for the BIA? Had the BIA published an opinion on the matter. That would be easy. We know that. But, yes. Substantively, why doesn't this make sense? Because here's the problem that I have. Let me give you a hypothetical. So let's say we're not dealing with the BNP. Let's say that the BIA said the entire population of the, I'm going to butcher this, so I apologize to anybody who's Bangladeshi, the Noakali, that's where Mr. Houdin is from, the Noakali District, and the BIA came to the conclusion it's a group, it's not formally authorized, but there's a subgroup, some people in that district, that engage in terrorist activities. So that province or district or whatever could be deemed a terrorist organization. And I think what we're struggling with is it can't be that that would apply. Because what you're asking us to do, I think, based on 242 and the other arguments you've made, is in that hypothetical we'd have to say, okay, that's a terrorist organization. And anyone from that area would not be eligible for withholding a removal. To continue along the INA in the statutory scheme that it creates, there are two additional important points as to your hypothetical, Your Honor. The first is, of course, the knowledge exception. Somebody in that group who did not know and had no reason to know that your group, as you're defining it, was engaged in terrorist activity would not be part of the bar. And they have to prove that by clear and convincing evidence that they didn't know. By a preponderance of the evidence, I believe, Your Honor. Oh, I thought it was clear and convincing. I might be mistaking that. Well, it says clear and convincing in B-1-6. Yes, I'm mistaken, Your Honor. That is correct. It would be clear and convincing evidence. So clear and convincing evidence that they had their head in the sand, because this is in the district in my hypothetical. Sure. I appreciate that. And the second part of the statutory scheme is this. There is under 1182 D-3-B, a waiver provision, that the Secretary of Homeland Security in consultation with the State Department may grant not only to the individual but to the entire group. So there is a slim chance that if you fall under either of these, you know, you could then be eligible for relief. But the way it's posited, if you're in Bangladesh and you're either in the BNP or the Awani League, I mean, the whole population of Bangladesh has no chance, correct? Because both of them engage in civil disobedience depending on who's in power and who isn't in power. And you've got to be in one of them, otherwise the other one is going to do bad things to you. So you can't sit on the sidelines, so you can never come to America. That's true. Well, now I think we're getting a little bit into whether a political organization can in fact be a terrorist organization. Okay, that's a good question. Is there any other political organization or party that has ever been held a terrorist organization? Yes, Your Honor. Tier 3. Tier 3. The Kurdistan Democratic Party in the Patriotic Union of Kurdistan, the Congress has actually legislated them out of terrorist activity in 2015. Legislated them out of terrorist activity? They actually legislated that they are not terrorist organizations. In 2008, there were certain Burmese political organizations, including organizations that fought along us inside the United States. They were also legislated in the 2008 Consolidated Appropriations Act. Congress determined that they are not terrorist organizations. But has the BIA found, the IJ and the BIA found? I'm sorry? Has the IJ or the BIA found them to be terrorist organizations? I don't know what was occurring prior to those years, but presumably if they took legislative activity to deem them not terrorist organizations, I apologize for the double negative, then one can presumably determine that they had in fact sort of been found. One of the things that troubled me about the analysis here is the very loose reference to events that would denote terrorist activity, most of which had to do with the 2013 elections. What in the record and in the opinions of the IJ and the BIA pinpoints violence that was condoned and taken by the BNP during this 08-11 timeframe, which is the relevant timeframe for Mr. Yudin's purposes? On page 237 of the administrative record, Your Honor, there is a report from Canadian Border Refugee, I don't quite remember the name of the Canadian agency, but it's a report that You were ready for this because you knew there really isn't very much, so you had a page. There was this, Your Honor, in 2011. What page was that, 237? 237. Your Honor, I appreciate that Mr. Yudin left in, I believe it was October of that year, but in 2011 in Bangladesh, 135 fatalities based on political violence, 11,532 injuries. And these were by the BNP specifically? No, that was political violence. The OILE could have done that. They could have done all of it, but that would be contrary to the administrative record, which shows that they go back and forth, and there's little question as to that, and they have been going back and forth since 1980. And what is this authoritative source? I'm sorry? The Canadian, I believe it's the Refugee Board, and I apologize, I don't have quite the name of the Canadian agency that compiled the report. So even if we went to 237 right now, there's nothing to ascribe any particular proportion of the violence to either the Awami League or the BNP? That's correct, Your Honor, but under the governing regulation, and I apologize, my time is up if I could. Thank you, Your Honor. Under 12 ACFR 1240.8D, if the evidence indicates that a bar may apply, it falls upon the applicant for that protection or relief from removal to prove by preponderance of the evidence that the bar ought not to apply. You're saying based on 237, the evidence indicates that the bar may apply, and then he gets to prove that there's nothing in his head, by clear and convincing evidence, that he should have known. Is there something in 237 that would tell us that the BNP entity was the one that authorized, condoned, failed to criticize the violence you just described? Not on page 237, Your Honor. Anywhere else in that document where it would have said anything about the BNP? In terms of authorization. Or anything we can infer from which the entity approved this behavior? Well, how can we prove that he didn't know something if page 237 doesn't ascribe it to anyone? Right? You can't say, other than say, I don't know what happened in 2011, right? I mean, how could you prove anything by preponderance of the evidence? Am I understanding this correctly? The Canadian Refugee Board says these number of deaths and these number of injuries happened in 2011. Yes. And they don't ascribe any number of them to either group, so he's supposed to get before a governing body and say, I didn't know what, because there's nothing there that says anyone in particular did anything. That's correct. This is an individual who grew up in, of course, Bangladesh, and this is a country where these two political parties have engaged in political violence all along, basically from the time he was born. I think it was 1983. I think Zia took power in 1984, and the evidence indicates, the record evidence, that there have been going after each other. So we should infer from the historical behavior these groups had towards each other, that when they act in a violent way, it's done with the concurrence of those who are in charge. So from that argument, everybody who's a member of the Obama League and everybody who's a member of the BNP would be barred from entering the United States, obtaining withholding of removal, because of their membership in those entities. Is that your position? And that's the controversy of the evidence, that they did not know and should not have known. You mean clear and convincing evidence that they did not or should not have known about the violence. But your retort to that is, this is so pronounced that everybody had to know. On this record, no, it's quite pronounced. This is not a case on the margins, and another record, another day, may in fact provide much less evidence. What is it that they're supposed to, well, here's what I'm confused about. What is it that they're supposed to know? When we have a trial, as happens in courtrooms everywhere all over, someone is ascribed liability or they've done X. So as you envision, I'm trying to seek withholding of removal. What is it that I'm supposed to say when I get on the stand or I'm making a statement? What is it that I'm supposed to say? Let me give you an example. And again, I'm speaking strictly hypothetically here. I'm beyond the record. No, I don't want you to go beyond the record. I want you to look at 2011. Use page 237. So there's all this violence. It's ascribed to no one. What is it that I could say to an I.J. to convince them by a preponderance of the evidence or clear and convincing evidence, we'll settle that later, about what is it that I knew or didn't know? If we're looking at page 237 and only page 237, you might well say, well, you know what, it doesn't ascribe any violence whatsoever to the BNP. But if we're looking at the record that that's before the court and before the I.J., then we have an understanding that this is back and forth extreme violence for decades. And in that case, particularly if it was somebody who joined a party, was promoted to general secretary and became a recruiter for the organization, the more violent student wing, you're right, there's very little to say there. Back and forth extreme violence for decades. Again, I say most of this evidence has to do with the elections post-dating 2011. The record reflects abundant evidence. Well, Your Honor, the BNP, for example, the rapid action battalion. And your position is, I mean, is your position that the CIA is a terrorist organization? Absolutely not, Your Honor, nor would I characterize it as a death squad. It would be unfair to do so. But, you know, I watch Homeland. I mean, there probably are government, you know, arms of the government that do engage in some, you know, extreme activities. But isn't it a fact that the RAB at the time the petitioner was a member, was it armed and under the control of the Awami League? That is correct, Your Honor. So what relevance does it have? Would its violence have anything to do with the BNP during that period? It wasn't at least error for the IJ and the BIA to rely on those activities. It was not within the control of the BNP. I just was attempting to answer Judge Rendell's question with respect to what occurred prior to. I was speaking to the decades of political violence that the Human Rights Watch reported, and particularly the RAB. So I was trying to answer Judge Rendell's question. But do you agree then, and I appreciate what you're saying, but do you agree then that the conduct of the RAB from 2008 and Mr. Odin is still a member of the organization to the present, is irrelevant because it's not within the control of the BNP? I think that's correct, Your Honor, with respect to those years, yes. I'd like to ask you, if it's with permission of the presider, I have a couple other questions. Why are those BIA decisions unavailable to the public? You were kind enough to respond to the court's order, but why are they not available? My best answer, I don't know if this is a fulsome one, if there are at ACFR 208.6 and to respect to the Justice Department regulations covering EOIR 1208.6, that they're essentially identical regulations, a silent confidentiality. You'll note that the Executive Office of Immigration Review supplied them in redacted form, and that's the reason why there are confidentiality reasons why they do not provide them to the public. Are they all accessible to the IJs? Because this IJ said he could not find any, was not aware of any BIA opinions on the BNP. I don't know the answer to that. I don't know well enough the internal workings of that agency. Because you would think that, I mean, if these go on appeal to the BIA, that the IJs ought to have an understanding of what the BIA is ruling, so that in the next case they can be guided. I appreciate that, Your Honor. I wish I could give you a better answer, but again, I just don't know the internal workings. I don't want to misspeak. But just to follow up on that point, occasionally our court is confronted with reviewing motions to reopen sua sponte. Yes. And our precedent is it's generally unreviewable, the decision on that subject, unless the activities of the BIA demonstrate a policy, a consistent ruling on consistent facts. If this is the practice, how would a court be able to determine, or the adversary, if they're not available easily because of confidentiality, I respect what you're saying, how would one be able to determine if by virtue of the decision-making there's been a development of a policy or a practice? I'm not sure that that – I appreciate your question. And it might not be answerable. I guess it's a concern. It's a concern. Yeah, it's a concern. And, you know, obviously we're – for reasons that I think Judge Reldell raised at the very beginning of her comments during this portion of argument is we have a static entity that's being reviewed 14 times as being not a terrorist organization, seven times it is. We have seven occasions in the past you gave us where the government didn't challenge the determination by the IJ that it wasn't a terrorist organization, which gives me a whole host of other questions as to how could the government have different positions on the same entity? And I imagine your answer is going to be it depends on how good the factual record is, but the government bears the burden of proof here, so I'm not quite sure how you answer that. But it is baffling how this could be this positional inconsistency and then inconsistency by the agency on relatively common facts. Yeah, are you able to give us any guidance on this? The best I can do, Your Honor, is to truly say that it's record by record, fact by fact, as to what the Department of Homeland Security – I don't understand. How can it be record by record if the response is – and it's in the record that Judge Reldell just wrote. You've told us a couple times this is decades of violence going back and forth. I'm fairly confident that that knowledge is going to be ascribed to anyone applying for withholding of removal. So if that, so to speak, is static, that's a given, everybody's going to say that there's decades of violence and that everyone, pardon me, there should be ascribed knowledge, then why can't we get to where we need to get to? It seems that it's not variable with regard to every particular instance because the government's response is going to be the same. And, in fact, it's really, just to follow up, it's the government's burden. The government's got to come forth and show evidence that indicates, in my mind, I envisioned basically a packet that's being presented consistently for the same time period about the same entities. It's not going to change. Anybody who's applying – let's take today, 2017. Anybody who's applying now is going to be applied in 2008 and 2011 and 2013. And the government's going to say, hey, during this entire period, everybody knows that violence abounded. It was both sides, your BNP, your Awami. We're not going to let you in because we all know that you know about it and we all know that you are a member of one party or the other. If I could attempt to answer that, and, again, I realize I'm well past at this point. With respect to a government burden, the regulation just speaks if the evidence indicates. There is no burden of proof on the government under that regulation. But you're looking for – you're looking to keep somebody out because you're trying to – that the person's inadmissible based on the terrorism bar and the government goes first and then the burden shifts to the petitioner. And that's really a burden-shifting position. That's when the burden shifts. That doesn't really describe the total nature of the government's burden. The government has to prove that it's within the definition. The government – let me back up again, if I could. The government's burden is to prove that Mr. Yudin is removable from the United States by clear and convincing evidence in this case, and it did so by his admission that he entered without inspection. He is then an applicant for relief and for protection. And the INA under INA 240, the burden is on the applicant for what is in the relief context, government largesse or protection to uphold our international obligations. The burden is at all times on the applicant, as it was here. So there were sort of two different phases in my work and I'm sure what this court sees. The government has already proven you are either inadmissible or removable from the United States. And what we tend to focus on and what the court tends to focus on is the applicant's application for, obviously it's most commonly asylum withholding or removal, et cetera. But that burden under the INA is at all times on the applicant and not on the government. I don't think we disagree with that point. It's just if you want to use the terrorism bar to preclude admission, the way I understand the, if you're going to invoke a mandatory bar, there has to be evidence that indicates one of the bars applies. Absolutely. Where else is that evidence coming from? The evidence, as it often does, comes from the applicant himself. But in this case, didn't it come largely from the government? Weren't there 16 articles? Yes, and the government has a right to but not an obligation to, except with the evidence. The other thing I want to draw your attention to is, again, I want to go back to, if I could, the waiver provision, the exemption provision, rather, at 1182D3B, and with respect to government policy, it could be that the Department of Homeland Security, as a function of executive discretion, decides to exempt both the BNP or the Iwami League from the application of the terrorism bars. Has it done so with the BNP? It has done so with neither. It has done so with other organizations, an Indian organization, but not with respect to either the BNP or the Iwami League. So there is an avenue for, I'll say, more consistent policy than I think Your Honor has noticed from the governments, from the 50-some-odd BIA decisions that you've reviewed. Well, maybe somebody should bring it to the attention of the Secretary of State. If you think it's a terrorist organization, get it designated. That would be a good way to do it, Your Honor. If there are no further questions, I thank Your Honor for the time. Thank you so much. Thank you. Thank you, Your Honor. I guess I would like to pick up from Judge Rendell's position that there are 160 million people in Mar-a-Lago. It's not a position. It's just an observation. There are 160 million people in Bangladesh. If we adopt this test, we are saying both parties, Iwami League and BNP, both are engaged in this thing, then none of them will be able to come to this country. All 140 million people will be branded as terrorists. If we adopt this analysis, Your Honor, that there are some groups, the circuit courts found as Tier 3 organizations, MQM, Eritrean Liberation Front. These are not democratic political parties. These are armed groups. In fact, the BIA itself expressed uneasiness about labeling BNP as a terrorist organization. In many opinions, the BIA said, We are unaware of any published decision from the board or the federal courts of appeals, which has concluded that the BNP, a widely recognized and long-standing political party in a democratic political system, qualifies as a terrorist organization. In many of those 50 opinions, the BIA felt uneasy to qualify them as a terrorist organization, Your Honor. The other thing regarding the CAD claim, Your Honor, one of the things, the CAD claim was denied by the IJ on the ground of adverse credibility finding. That was the main factor for the IJ to deny the CAD claim, whereas the BIA did not even address the credibility issue. So, without addressing the credibility issue, the BIA cannot simply say that, if you say that it was not BIA, it was summarily dismissed. They cannot do it because the credibility is an important issue on the CAD claim also. So, the BIA should have addressed the CAD claim, then on the credibility issue, then only they could have dismissed the CAD claim. That's all, Your Honor. Thank you. Thank you. Thank you very much. Thank you. Thank you, counsel, for a well-argued case. We'll take it under advisement and bid everyone a fond good afternoon.